Upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the award, except for minor modifications, the Full Commission AFFIRMS and ADOPTS the Opinion and Award of the Deputy Commissioner as follows:
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing before the Deputy Commissioner as:
STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. The employer-employee relationship existed between the plaintiff and the defendant-employer.
3. The defendant-employer is self-insured with Gallagher Bassett Services, Inc. serving as the servicing agent.
4. Plaintiff's average weekly wage is as set forth on the Form 22 (wage chart).
5. Plaintiff is alleging an injury by accident that occurred on March 27, 1995 when he fell, resulting in an injury to the back.
6. The defendant-employer admitted that plaintiff fell, but denied that he suffered any injury resulting from the fall.
7. Plaintiff is seeking temporary total disability benefits from June 8, 1995, through April 1, 1996, medical expenses, and a rating, if any.
8. The issue to be determined by the Commission is whether plaintiff suffered an injury resulting from the fall.
*****************
Based upon all of the competent evidence from the record herein, the Full Commission adopts the findings of fact by the Deputy Commissioner with minor modifications as follows:
FINDINGS OF FADO
1. On March 27, 1995, plaintiff had been working for the defendant-employer for ten years and had missed work only one and one-half days during that period.
2. On March 27, 1995, the plaintiff was an order filler and forklift operator with the defendant-employer. During the morning of March 27, 1995, the plaintiff was asked to retrieve 25-gallon buckets of paint weighing 50-60 pounds each from the top level of some pallet-storage in the warehouse. The pallet storage was three to four levels above the warehouse floor, and it was necessary to climb successive levels of pallets in a stair-like fashion in order to reach those levels. When the plaintiff reached the top level of the pallets, he reached over his head to take a bucket in each hand. He then had to lower these buckets without breaking the next pallet level below his feet which was four feet below the pallet he was standing on. After taking the paint buckets in each hand, the plaintiff bent at the waist below his feet "real far down" until he lost his grip on the buckets. After this, the plaintiff reported that he lost his balance while descending, bumped his side the upper hip against a pallet across the aisle and felt a knife-like pain.
3. Julian Pegram, a co-worker, approximately fifty (50) feet away, heard the plaintiff's fall and came to his aid on the floor. The incident was reported to management and the plaintiff worked through the end of the day.
4. Overnight, the plaintiff noticed that his discomfort was aggravated when he tried to get up and down from a sitting position. When he reported his continuing pain to defendant-employer on March 28, 1995, he was sent to the Henderson Family Clinic, the company physicians. According to the note from the Henderson Family Clinic of that day, the plaintiff was thought to have a "contusion" which was explained to the plaintiff as a "hip pointer." However, there was no discoloration in the area which would suggest a soft tissue injury. Pain medication was prescribed. The plaintiff was told to go home; he did not work the remaining three days of the week.
5. When the plaintiff arrived at his home in Clarksville, he noticed that he had a regularly scheduled appointment with his chiropractor, Dr. Richard Brown. The plaintiff originally saw Dr. Brown for acute treatment following a back strain in the early 1980's and was being seen on a "check-up" basis every three months in March of 1995. At the time of his appointment on the 28th of March, 1995, the plaintiff did not tell Dr. Brown of his injury because he did not think he had a "back problem." Dr. Brown did not note a visible bruise (contusion) and did not inquire of the plaintiff. According to Dr. Brown, the plaintiff does not offer a lot of information unless you "drag it out" of him.
6. For the remainder of the week, the plaintiff remained out of work, largely in his bed or in his "lounge chair".
7. On Sunday, April 2, 1995, the plaintiff's pain had increased to the point that he sought emergency room treatment at Halifax Regional Hospital Emergency Department in South Boston, Virginia. The Triage Assessment and emergency room notes document left upper leg pain shooting down the leg and the mechanism of injury. Again, no discoloration in the painful area was noted and orthopaedic follow-up was suggested. Most significantly, x-ray findings of the hip and pelvis were: "No fractures or dislocations are noted. The soft tissues appear normal." Along with the absence of discoloration in the hip area, the x-ray would appear to rule out "contusion" as the cause of the plaintiff's left hip pain.
8. The plaintiff returned to work the following week and continued to do so with the help of medications, "popping pills." The plaintiff, his wife, and others reported that he increasingly limped or dragged his left leg.
9. Although he would not specify the time frame, Julian Pegram, a co-worker, also observed that the plaintiff limped or dragged his leg. According to the plaintiff, he requested of his superior, Mr. Savic, permission to see another doctor or specialist because of his pain. This request was denied; however, the plaintiff reported that he was told that he would be sent home for three days because his work was falling below expectations.
10. The plaintiff's physical limitations related to his back were further demonstrated by the testimony of his wife and neighbor, Clarence Stophel. As noted earlier, both described the plaintiff's difficulties arising from his recliner and walking at home. Because of his wife's later working hours at Revlon, the plaintiff usually cooked supper and tended to household tasks. Following his injury, the plaintiff discontinued cooking and household activities and began to spend most of his time in bed or in the recliner in order to be ready for the next day. According to Mr. Stophel, the plaintiff curtailed his visits to his home because of difficulties going up and down the steps. The plaintiff also stopped bowling and golfing with his neighbor.
11. On April 28, 1995, the plaintiff returned to his chiropractor, Dr. Brown, for treatment. At the time, the plaintiff did not report any additional trauma to Dr. Brown, but treatment was focused on the plaintiff's left-sided pain and left leg pain and continued until June 6, 1995. When Dr. Brown determined that the plaintiff was not progressing as expected, the plaintiff was referred for neurosurgical evaluation and treatment by Dr. Robert Price. The plaintiff was taken out of work on June 6, 1995.
12. Although the company and servicing agent, Gallagher Bassett, have denied liability, the plaintiff was required to see Dr. William Lestini with Triangle Orthopaedics, rather than Dr. Price. An appointment with Dr. Lestini could not be scheduled until July 5, 1995. By this time, the plaintiff's pain had increased to the point that it was unbearable.
13. Finally, at the request of the plaintiff's wife, the plaintiff was authorized to return to the Henderson Family Clinic for pain medications. In the note of June 16, 1995, it was noted:
 WC — LT — back pain . . . S: 40-year-old white male injured (L hip at work) in March. C/O worsening pain since injury. Has been seeing a chiropractor x 2 months without relief and to emergency department (eds) without relief. O: Well male in NAD (+ pain) . . . limps slightly sitting with knee flexed. I: Herniated disc L5-S1 . . .
14. Dr. Lestini indicated that the plaintiff was referred to him for evaluation by Michael Bardyn for an independent medical evaluation, and it was presented to him that the plaintiff had a work-related injury. A detailed history was given, and a physical was performed in which the plaintiff outlined his history of injury. Dr. Lestini's evaluation of that date concluded: "In summary, I feel this patient was a (an) L5-S1 radiculopathy with probable L5-S1 disc disease. I think his diagnosis is consistent with the mechanics of his injury. I think he is temporarily disabled from his described job due to his complaints and the fact that I don't think he is yet at maximum medical improvement."
15. From July 5, 1995 through September, 1995, the plaintiff was treated with physical therapy and medications. An MRI in September, 1995 disclosed a "fairly impressive disc herniation at L5-S1." This was further confirmed by a myelogram and DO scan in December, 1995 which again showed a left central HNP at L5-S1. Surgery was performed on December 18, 1995. In preparation for the surgery, the plaintiff required medical management through the offices of Dr. Daisy Ann Rodriguez with Raleigh Family Physicians to address the blood pressure problems that could complicate surgery.
16. Following the surgery, the plaintiff reported immediate reduction in left leg pain to the effect "The pain was gone, I could walk good."
17. Following his discharge, the plaintiff improved rapidly. Dr. Lestini approved the plaintiff for return to light duties on January 30, 1996, but the employer would not permit a return to work until he was "a hundred percent." Dr. Lestini found the plaintiff reached maximum medical improvement at the time of his March 12, 1996 appointment. However, after the plaintiff returned to work the first time on March 18, 1996, he was off the job after two hours because of the "insurance company." It was not until approximately April 1, 1996, that he returned to work and had continued to do so through the present time. According to Dr. Lestini, the plaintiff retains a 7.5% permanent partial disability of the back.
18. The plaintiff did receive approximately eight (8) weeks of company-paid disability benefits at the rate of $100.00 per week, less deductions.
Based on the foregoing stipulations and findings of fact, the Full Commission makes the following:
*****************
 CONCLUSIONS OF LAW
1. Plaintiff suffered an injury by accident arising out of and in the course of the employment; therefore, he is entitled to benefits under the Workers' Compensation Act. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff was temporary totally disabled from June 6, 1995, through April 1, 1996; therefore, he is entitled to benefits at the compensation rate of $233.45 per week for said period of time. N.C. Gen. Stat. § 97-29.
3. Plaintiff suffers a 7.5% permanent partial disability impairment to the back resulting from the injury by accident as a result he is entitled to benefits at the compensation rate of $233.45 per week for a total of 22.5 weeks. N.C. Gen. Stat. § 97-31.
4. Defendants shall pay all medical expenses incurred or to be incurred by plaintiff as a result of this injury by accident reasonably required to effect a cure or give relief or to lessen the period of disability. N.C. Gen. Stat. § 97-25.
5. Defendants agreed to submit a Form 22 wage chart but failed to do so; therefore, plaintiff's average weekly wage was determined from the Form 19 submitted by the defendant-employer which shows an average weekly wage of $350.00 yielding a compensation rate of $233.45 per week.
*****************
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
AWARD
1. Defendants shall pay temporary total disability benefits to plaintiff at the compensation rate of $233.45 per week from June 6, 1995, through April 1, 1996. That compensation has accrued and shall be paid to plaintiff in a lump sum subject to the attorney's fee hereinafter approved.
2. Defendants shall pay permanent partial disability benefits to plaintiff at the compensation rate of $233.45 per week for a total of 22.5 weeks. That compensation has accrued and shall be paid to plaintiff in a lump sum subject to the attorney's fee hereinafter approved.
3. Defendants shall pay all medical expenses incurred by plaintiff as a result of this injury by accident reasonably required to effect a cure or give relief or to lessen the period of disability.
4. An attorney's fee in the amount of twenty-five percent (25%) of the Award is hereby approved for plaintiff's counsel. Said amount shall be deducted an paid directly to plaintiff's counsel.
5. Defendants shall pay the costs due the Commission.
 S/ ________________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
S/ ______________________ LAURA K. MAVRETIC COMMISSIONER
S/ ______________________ DOUGLAS E. BERGER DEPUTY COMMISSIONER
BSB:jth